**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

—————

MCARDLE FAMILY PARTNERSHIP, a Pennsylvania Limited
Partnership, individually and on behalf of others similarly situated,

*Plaintiff/Appellant,*

— v. —

ANTERO RESOURCES CORPORATION, a Delaware corporation;
KEY OIL COMPANY, a West Virginia corporation;
FRANKLIN L. BUTLER, an individual,

*Defendants/Appellees.*

—————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT CLARKSBURG

**REPLY BRIEF OF APPELLANT**

Frank E. Simmerman, III
**SIMMERMAN LAW OFFICE, PLLC**
254 East Main Street
Clarksburg, West Virginia 26301
(304) 623-4900
*Counsel for Appellant*

## TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ...............................................................................1

II. ARGUMENT .....................................................................................7

    A. The Granting Clause Contained In The 1996 Assignment Agreement Is Not A Clear And Broad Conveyance, But Is Rather A Limited Assignment, Subject To All Net Profits And Overriding Royalty Payments Disclosed To The Assignee, And The Granting Language Is Further Restricted By The Limitations Contained Within Exhibit A To The 1996 Assignment Agreement ..........................................................7

    B. As The Form Of An Exception Is Immaterial Under West Virginia Law, And As The 1996 Assignment Agreement Contains Certain, Definite, Plain And Unequivocal Words Of Limitation/An Intent To Limit The 1996 Assignment Agreement And Preserve The Overriding Royalties And Net Profits Interests In MFP's Chain Of Title, The District Court's Decision Must Be Reversed ........................................12

    C. As The Doctrine Of Merger Has No Relevance To The Present Dispute Given That The Plain Language Of The 1996 Assignment Agreement Preserves And Excepts The ORRI Interests In MFP's Chain Of Title, And As Justice Requires Such A Finding, This Court Should Find That The ORRI Interests Are Vested In MFP ..............18

III. CONCLUSION ..............................................................................23

# TABLE OF AUTHORITIES

**Cases** ............................................................................................................... Page(s)

Aetna Cas. & Sur. Co. v. Holsten, 100 F.3d 950 (4th Cir. 1996) ........................5, 11

Conn v. Beckman, 2019 W. Va. LEXIS 409 *18 ....................................................19

Elliott (Canada) Ltd. v. John T. Clark & Son of Maryland, Inc., 704 F.2d 1305, 1308 (4th Cir. 1983) ..............................................................................................5

Freudenberger Oil Co. v. Simmons, 75 W. Va. 337, 83 S.E. 995 ...........................12

Highland Park Mfg. Co. v. Steele, 232 F. 10 (4th Cir. 1916)...................................19

Highway Properties v. Dollar Sav. Bank, 189 W.Va. 301, 431 S.E.2d 95 (1993) ...19

Liberty Ins. Underwriters, Inc. v. Camden Clark Memorial Hosp. Corp, No. 6:08-CV-01219, 2009 WL 4825199, at *5 (S.D.W.V. Dec. 8, 2009) ..........................11

Orphanos v. Rodgers, 2024 W. Va. App. LEXIS 169, FN 14 (June 13, 2024)..........1

Page v. Fees-Krey, Inc., 617 P.2d 1188, 1195-1196 (Colorado, 1980)...................22

White Flame Coal Co. v. Burgess, 86 W. Va. 16, 20-21; 102 S.E. 690 (1920) .......12

Zimmerer v. Romano, 223 W. Va. 769, 679 S.E.2d 601, 610 (W. Va. 2009) ..........11


**Other Authorities**

28 C.J.S. Easements § 57(b) (1941).........................................................................19

28A CJS, Easements, § 123 [b], at 307...................................................................19

Black's Law Dictionary, Ab. 7th Edition, 2004 .....................................................20

https://www.merriam-webster.com/dictionary/all ....................................................7

Restatement (2d), Contracts § 203 ...........................................................................5

## I.    INTRODUCTION

Appellees are asking this Court to uphold a reading of the 1996 Assignment Agreement that was never bargained for or obtained in 1996 – a reading which selectively and improperly frames the granting language of the 1996 Assignment Agreement, while completely ignoring the limiting and restrictive language of the governing 1996 Assignment Agreement.[1]

Indeed, Appellees boldly insist that the term "all" has a broad and all-inclusive meaning within the 1996 Assignment Agreement – yet the Appellees then fail to analyze and give meaning to "all" of the language within the 1996 Assignment Agreement.[2]

---

[1] It is submitted that Appellees have improperly quoted the granting clause in their Response Brief by inserting a period after the phrase "which is attached hereto", suggesting that the portion of the granting clause upon which Appellees base their argument is a conclusion to a complete sentence. See e.g. Response Brief, pg. 8. It is not. Appellees, for their own purposes, elected not to utilize an ellipsis to signify to this Court that the relied upon granting language is incomplete. Had Appellees properly used an ellipsis, that would have signified to this Court that the language "quoted" by the Appellees is incomplete.

[2] As recently noted by the West Virginia Intermediate Court of Appeals in Orphanos v. Rodgers, 2024 W. Va. App. LEXIS 169, FN 14 (June 13, 2024), "what's good for the goose is good for the gander." Appellees cannot present a credible argument to this Court premised upon the concept of "all" which wholly fails to analyze and give meaning to "all" of the governing contract language in this case contained in the 1996 Assignment Agreement. Indeed, Appellees fail to offer any context specific reading of "all" of the text of the 1996 Assignment Agreement which is: (1) logical; (2) pragmatic; or (3) which accounts for the limiting language discussed below.

Stated differently, the Appellees' presentation to this Court vividly demonstrates the flawed and incomplete reasoning conducted by the District Court as the Appellees' briefing is self-defeating insofar as the Appellees emphasize the necessity of complete and thorough textual and contract specific analysis, yet the Appellees then fail to give any meaning to essential terms of the 1996 Assignment Agreement.

Tellingly, within the same sentence as the "all" encompassing granting language is the preface for the exceptions within the 1996 Assignment Agreement:

NOW, THEREFORE, THIS AGREEMENT WITNESSETH:

That for and in consideration of the sum of One Dollar ($1.00) cash in hand paid, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, James I. Shearer and Beatrice E. Shearer, his wife, and James Drilling Corporation, a corporation, AKA James I. Shearer Drilling Co., do hereby grant, sell, assign, transfer and convey to Key Oil Company <u>all</u> of their right, title and interest in and to those certain oil and gas leases, the oil and gas leasehold estates created thereby and the oil and or gas wells situated thereon, being situate in Central and Greenbrier Districts, Doddridge County, West Virginia and Union District, Ritchie County, West Virginia, <u>and being more particularly described by the oil and gas lease information and the oil and gas well API numbers set forth in Exhibit "A" which is attached hereto and considered a part hereof, except as hereinafter provided,</u>

This Assignment Agreement is expressly made subject to the following terms and conditions:

1. Assignee shall, upon execution of this agreement, make the necessary applications for transfer of said oil and/or gas wells to its name with the appropriate governmental agencies of the State of West Virginia, which transfer shall include Assignee's compliance

with all well bonding and plugging requirements imposed upon oil and gas well operators by the State of West Virginia.

2. Assignee covenants and agrees to comply with the terms and conditions of the Oil and Gas Leases described in Exhibit "A", including but not limited to, the payment of all net profits, payments, royalty and overriding royalty as defined in the leases or any assignments heretofore disclosed to Assignee. . . .

Exhibit A: Assignment Agreement by and between James I. Shearer and James Drilling Corporation, AKA, James I. Shearer Drilling Co., and Key Oil Company
Dated May 30, 1996
Page two

Note: The specific parts of the oil and gas leasehold estates created by the oil and gas leases described in Nos. 6 and 7 above, which are assigned by operation of the Assignment Agreement are as follows:

1. All that certain forty (40) acre portion of that certain oil & gas lease from C.P. Hudson et al to James I. Shearer as set forth in that certain assignment from James I. Shearer to Worldwide Petroleum Corporation dated April 15, 1961 and recorded in the records of Doddridge County, WV in Deed Book 67 Page 477 upon which a well known as C. P. Hudson Well #1 was drilled and

2. All that certain forty (40) acre portion of that certain oil & gas lease from C.P. Hudson et al to James I. Shearer as set forth in that certain assignment from James I. Shearer to Worldwide Petroleum Corporation dated February 1, 1961 and recorded in the records of Doddridge County, WV in Deed Book 67 Page 480 upon which a well known as C. P. Hudson Well #2 was drilled and

3. All that certain forty (40) acre portion of that certain oil & gas lease from C.P. Hudson et al to James I. Shearer as set forth in that certain assignment from James I. Shearer to Worldwide Petroleum Corporation dated June 20, 1961 and recorded in the records of Doddridge County, WV in Deed Book 70 Page 460 upon which a well known as C. P. Hudson Well #3 was drilled and

4. <u>All that certain forty (40) acre portion of that certain oil & gas lease</u> from C.P. Hudson et al to James I. Shearer as set forth in that certain assignment from James I. Shearer to Worldwide Petroleum Corporation dated June 20, 1961 and recorded in the records of Doddridge County, WV in Deed Book 71 Page 25 <u>upon which a well known as C. P. Hudson Well #4 was drilled</u> and

5. <u>All that certain forty (40) acre portion of that certain oil & gas lease</u> from C.P. Hudson et al (William Rollins) to James I. Shearer as set forth in certain Assignment Agreements from James Drilling Corporation to various individuals which stipulated a forty (40) acre area nearest surrounding said well.

6. <u>All that certain area which lies within one thousand (1,000) feet of any presently existing well upon either of the aforesaid leases, anything to the contrary notwithstanding</u>.

JA316–320 (emphasis added).

When confronted with this plain language, Appellees evade and dissemble. Appellees do not contest that the net profits and overriding royalties owned and claimed by the McArdle Family Partnership, ("MFP"), were disclosed to the purchaser/Assignee in the 1996 Assignment Agreement, they simply gloss over this material fact and the limitation and exception contained in Paragraph 2. Similarly, Appellees gloss over the express reality that, in relation to the Hudson acreage, per Exhibit A, Page 2, only "specific parts" of the oil and gas leasehold estates were assigned, wellbore interests and an additional 1,000 foot buffer: "[a]ll that certain area which lies within one thousand (1,000) feet of any presently existing well upon either of the aforesaid leases, <u>anything to the contrary notwithstanding</u>." JA316–320 (emphasis added).

These positions defy every rule of contract interpretation. As explained below, specific contract provisions control over general ones, not the other way around. Aetna Cas. & Sur. Co. v. Holsten, 100 F.3d 950 (4th Cir. 1996) ("[W]hen interpreting a contract, a court should follow the interpretive philosophy that specific language trumps general text.") (unpublished). Likewise, separately negotiated provisions control over boilerplate language. See B. Elliott (Canada) Ltd. v. John T. Clark & Son of Maryland, Inc., 704 F.2d 1305, 1308 (4th Cir. 1983) ("According to general rules of contract interpretation, separately negotiated or added terms will prevail over the conflicting printed part of a contract."); Restatement (2d), Contracts § 203 (providing that "separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated").

Perhaps more fundamentally, Appellees' arguments defy common sense.

It is the duty of the Court, and the parties, to give reasonable meaning to all terms and conditions within a contract, such as the 1996 Assignment Agreement, not to fixate on the term "all" without a context and contract specific analysis.

Stated simply, why, if the 1996 Assignment Agreement was truly a blanket conveyance of "all" interests owned by the Assignor, does the 1996 Assignment Agreement not simply state this? Why did the Appellees, specifically Key Oil Company, not insist upon such clear language, rather than utilizing language in the 1996 Assignment Agreement which contains exceptions on the face of the

instrument, such as "except as hereinafter provided", and plain language which notes that limited, "specific parts" were assigned in 1996 in relation to the Hudson mineral acreage per the Exhibits to the 1996 Assignment Agreement?

As explained below, the reality is that such limiting and plain terms, ignored by the Appellees and the District Court, clarifies the actual nature of the 1996 Assignment Agreement and vest title to the overriding royalties and net profits interests in MFP.

In closing, the Appellees' briefing depicts a deal they wish had been made in the 1996 Assignment Agreement, rather than the deal which Key Oil Company actually made with MFP's predecessor in title. The Court must apply the 1996 Assignment Agreement as it is written, not as Appellees wish the 1996 Assignment Agreement had been written. As written, the 1996 Assignment Agreement is a limited assignment which expressly preserves and vests the overriding royalties and net profits interest in MFP. Such a reading is the only reading which is consistent with the express language of the 1996 Assignment Agreement, as explained further below.

## II. <u>ARGUMENT</u>

**A. The Granting Clause Contained In The 1996 Assignment Agreement Is Not A Clear And Broad Conveyance, But Is Rather A Limited Assignment, Subject To All Net Profits And Overriding Royalty Payments Disclosed To The Assignee And The Granting Language Is Further Restricted By The Limitations Contained Within Exhibit A To The 1996 Assignment Agreement.**

Throughout their response, Appellees maintain that the 1996 Assignment Agreement is a clear and broad conveyance, without limitation or exception. In this vein, Appellees rely on the following definition of the term "all": "All," *Merriam-Webster* https://www.merriam-webster.com/dictionary/all (last visited July 9, 2024) (defining "all" as: "(1)(a) the whole amount, quantity, or extent of; (b) as much as possible; (2) every member or individual component of; (3) the whole number or sum of; (4) every; (5) any whatsoever"). Response Brief at 18.

But the 1996 Assignment Agreement says no such thing. The 1996 Assignment Agreement is very clear. It provides that the "all" language is modified by exception language, and that the 1996 Assignment Agreement is not all encompassing or unlimited as argued by the Appellees.

Indeed, the 1996 Assignment Agreement plainly provides that all "net profits, payments, royalty and overriding royalty as defined in the leases or any assignments heretofore disclosed to Assignee" were excepted from the 1996 Assignment Agreement and that only "specific parts" of the Hudson mineral acreage were assigned by operation of the 1996 Assignment Agreement, as follows:

Note: <u>The specific parts of the oil and gas leasehold estates created by the oil and gas leases described in Nos. 6 and 7 above, which are assigned by operation of the Assignment Agreement are as follows:</u>

1. <u>All that certain forty (40) acre portion of that certain oil & gas lease</u> from C.P. Hudson et al to James I. Shearer as set forth in that certain assignment from James I. Shearer to Worldwide Petroleum Corporation dated April 15, 1961 and recorded in the records of Doddridge County, WV in Deed Book 67 Page 477 <u>upon which a well known as C. P. Hudson Well #1 was drilled</u> and

2. <u>All that certain forty (40) acre portion of that certain oil & gas lease</u> from C.P. Hudson et al to James I. Shearer as set forth in that certain assignment from James I. Shearer to Worldwide Petroleum Corporation dated February 1, 1961 and recorded in the records of Doddridge County, WV in Deed Book 67 Page 480 <u>upon which a well known as C. P. Hudson Well #2 was drilled</u> and

3. <u>All that certain forty (40) acre portion of that certain oil & gas lease</u> from C.P. Hudson et al to James I. Shearer as set forth in that certain assignment from James I. Shearer to Worldwide Petroleum Corporation dated June 20, 1961 and recorded in the records of Doddridge County, WV in Deed Book 70 Page 460 <u>upon which a well known as C. P. Hudson Well #3 was drilled</u> and

4. <u>All that certain forty (40) acre portion of that certain oil & gas lease</u> from C.P. Hudson et al to James I. Shearer as set forth in that certain assignment from James I. Shearer to Worldwide Petroleum Corporation dated June 20, 1961 and recorded in the records of Doddridge County, WV in Deed Book 71 Page 25 <u>upon which a well known as C. P. Hudson Well #4 was drilled</u> and

5. All that certain forty (40) acre portion of that certain oil & gas lease from C.P. Hudson et al (William Rollins) to James I. Shearer as set forth in certain Assignment Agreements from James Drilling Corporation to various individuals which stipulated a forty (40) acre area nearest surrounding said well.

6. All that certain area which lies within one thousand (1,000) feet of any presently existing well upon either of the aforesaid leases, anything to the contrary notwithstanding.

JA316–320 (emphasis added).

The fundamental flaw with the Appellees' reasoning, and the District Court's holding, is that both the District Court and Appellees fail to acknowledge and give meaning to "all" of the terms and conditions of the 1996 Assignment Agreement.

The only reading of the of the 1996 Assignment Agreement which looks at "all", meaning every individual component of, the 1996 Assignment Agreement leads to the inescapable conclusion that, per its express terms and conditions the 1996 Assignment Agreement was a limited conveyance which vests title to the overriding royalties and net profits interests in MFP as: (1) these mineral interests were expressly excepted in the operation by virtue of Paragraph 2, and (2) in relation to the Hudson overriding royalty/net profits interests, these assets were retained within MFP's chain of title as the 1996 Assignment Agreement was a mere conveyance of "specific parts" of the leasehold estate upon which shallow oil and gas wells were drilled, plus buffer acreage of 1,000 feet from any well which existed at the time of the 1996 transaction.

What Appellees really want is for their strained *interpretation* of the granting clause of the 1996 Assignment Agreement to control and trump all other paragraphs and limitations within the 1996 Assignment Agreement.

Specifically, even though the granting clause is limited and exceptions are contained on the face of the 1996 Assignment Agreement, the Appellees urge this Court to: (1) ignore the specific language contained within the granting clause which consistently states that the granting clause has a limitation, "except as hereinafter provided" in the 1996 Assignment Agreement; (2) ignore the specific language of Paragraph 2 of the 1996 Assignment Agreement; (3) ignore the specific language of Exhibit A to the 1996 Assignment Agreement which states that, in relation to the Hudson mineral acreage the assignment is limited to "specific parts" of the leasehold estate; (4) find that the granting clause, which is restricted on its face, somehow controls over other, inconsistent provisions contained within the 1996 Assignment Agreement, even where such provisions are more specific and state that they apply "anything to the contrary notwithstanding". <u>See</u> JA316–320.[3]

---

[3] Appellees also argue that the word "all" loses its meaning if any other interpretation is found. <u>See</u> Response Brief, pg. 19. This is simply not true and again defies common sense. The Assignees acquired shallow well interests in the noted oil and gas wells, subject to overriding royalties and net profits disclosed to the Buyer/Assignee. For decades, Key Oil Company has profited from these shallow oil and gas wells.

The circuitous path Appellees invite this Court to follow violates multiple rules of contract interpretation, including rules providing that specific contract terms control over general ones, that all contract language should be given a fair meaning, and that separately negotiated provisions control over boilerplate ones. See Aetna Cas. & Sur. Co. v. Holsten, 100 F.3d 950 (4th Cir. 1996) ("[W]hen interpreting a contract, a court should follow the interpretive philosophy that specific language trumps general text.") (unpublished); see also Liberty Ins. Underwriters, Inc. v. Camden Clark Memorial Hosp. Corp, No. 6:08-CV-01219, 2009 WL 4825199, at *5 (S.D.W.V. Dec. 8, 2009) ("[i]n interpreting a contract, 'specific terms and exact terms are given greater weight than general language.' "); see also Zimmerer v. Romano, 223 W. Va. 769, 679 S.E.2d 601, 610 (W. Va. 2009) (noting that the court must read the contract as a whole, taking into consideration all the parts together).

Such an untenable path should be rejected by the Court, and this Court should hold that the 1996 Assignment Agreement was not an all-encompassing grant as held by the District Court, but was rather a restricted and limited grant of already fractured oil and gas wells and related/limited mineral leasehold estates wherein, per the 1996 Assignment Agreement's express terms, the existing overriding royalty and net profits interests presently vested in MFP were excepted and protected through the plain language of Paragraph No. 2 of the 1996 Assignment Agreement and the limited language set forth within Exhibit A to the Assignment Agreement.

**B.** **As The Form Of An Exception Is Immaterial Under West Virginia Law, And As The 1996 Assignment Agreement Contains Certain, Definite, Plain And Unequivocal Words Of Limitation/An Intent To Limit The 1996 Assignment Agreement And Preserve The Overriding Royalties And Net Profits Interests In MFP's Chain Of Title, The District Court's Decision Must Be Reversed.**

Contrary to the Appellees' argument, there is not a rigid/mathematical formula by which exceptions in deeds/assignments are judged.

Rather, the legal framework in West Virginia is flexible, and the form of an exception is immaterial – the parties' intent controls:

> [a]n exception by a grantor having title, is a mere withholding of title to part of the property described in the deed. Hence, if he declares in the deed that he does not grant or undertake to convey part of such property, he excepts the designated part. The form of an exception is immaterial. It may be effected by the use of any words expressing intention to except. Freudenberger Oil Co. v. Simmons, 75 W. Va. 337, 83 S.E. 995, syl. pt. 7. An exception may appear in any part of a deed. It may be inserted between the habendum and the warranty and in the same paragraph with the former. Id. (emphasis added).

White Flame Coal Co. v. Burgess, 86 W. Va. 16, 20-21; 102 S.E. 690 (1920).

Here, there are two noted, definite and certain exceptions by which interests are excepted from operation of the 1996 Assignment Agreement, consistent with the "except as hereinafter provided" language contained within the granting clause.

First, "all net profits, payments, royalty and overriding royalty as defined in the leases or any assignments heretofore disclosed to Assignee" are expressly preserved by, and excepted from, the granting language of the 1996 Assignment Agreement. JA316–320 (emphasis added).

Second, in relation to the Hudson leasehold acreage, only "specific parts" of the leasehold estates, which did not impact the Marcellus Shale rights/payments at issue in this litigation, were assigned per Exhibit A:

> Exhibit A: Assignment Agreement by and between James I. Shearer and James Drilling Corporation, AKA, James I. Shearer Drilling Co., and Key Oil Company
> Dated May 30, 1996
> Page two
>
> Note: <u>The specific parts of the oil and gas leasehold estates created by the oil and gas leases described in Nos. 6 and 7 above, which are assigned by operation of the Assignment Agreement are as follows</u>:
>
> 1. <u>All that certain forty (40) acre portion of that certain oil & gas lease</u> from C.P. Hudson et al to James I. Shearer as set forth in that certain assignment from James I. Shearer to Worldwide Petroleum Corporation dated April 15, 1961 and recorded in the records of Doddridge County, WV in Deed Book 67 Page 477 <u>upon which a well known as C. P. Hudson Well #1 was drilled</u> and
>
> 2. <u>All that certain forty (40) acre portion of that certain oil & gas lease</u> from C.P. Hudson et al to James I. Shearer as set forth in that certain assignment from James I. Shearer to Worldwide Petroleum Corporation dated February 1, 1961 and recorded in the records of Doddridge County, WV in Deed Book 67 Page 480 <u>upon which a well known as C. P. Hudson Well #2 was drilled</u> and
>
> 3. <u>All that certain forty (40) acre portion of that certain oil & gas lease</u> from C.P. Hudson et al to James I. Shearer as set forth in that certain assignment from James I. Shearer to Worldwide Petroleum Corporation dated June 20, 1961 and recorded in the records of Doddridge County, WV in Deed Book 70 Page 460 <u>upon which a well known as C. P. Hudson Well #3 was drilled</u> and
>
> 4. <u>All that certain forty (40) acre portion of that certain oil & gas lease</u> from C.P. Hudson et al to James I. Shearer as set forth in that certain assignment from James I. Shearer to Worldwide Petroleum

Corporation dated June 20, 1961 and recorded in the records of Doddridge County, WV in Deed Book 71 Page 25 <u>upon which a well known as C. P. Hudson Well #4 was drilled</u> and

5. <u>All that certain forty (40) acre portion of that certain oil & gas lease</u> from C.P. Hudson et al (William Rollins) to James I. Shearer as set forth in certain Assignment Agreements from James Drilling Corporation to various individuals which stipulated a forty (40) acre area nearest surrounding said well.

6. <u>All that certain area which lies within one thousand (1,000) feet of any presently existing well upon either of the aforesaid leases, anything to the contrary notwithstanding</u>.

JA316–320 (emphasis added).

For purposes of this argument MFP will adopt the Appellees' definition of the term "all" as "(1)(a) the whole amount, quantity, or extent of; (b) as much as possible; (2) every member or individual component of; (3) the whole number or sum of; (4) every; (5) any whatsoever"). Response Brief at 18.

Adopting Appellees' definition, Paragraph 2 means "the whole amount, quantity, or extent of" or "as much as possible" of the overriding royalties and net profits which were disclosed to Appellee Key Oil in the 1996 Assignment Agreement transaction.

And, it is uncontested on appeal that the at issue overriding royalty interests were not depth restricted or limited and that they were generally available, known and disclosed to the parties at the time of the 1996 Assignment Agreement as they were part of the due diligence process related to the 1996 transaction. <u>See</u> JA521–

528 (1996 due diligence documents and Key Oil business records which plainly evidence that at the time the parties contracted/executed the 1996 Assignment Agreement Key Oil: (1) had actual knowledge of the overriding royalty interest burden as to the Towner acreage vested in MFP's predecessor/chain of title; (2) had actual knowledge of the overriding royalty interest burden as to the Stone acreage vested in MFP's predecessor/chain of title; (3) had actual knowledge of the overriding royalty interest burden as to the Hudson acreage vested in MFP's predecessor/chain of title; and (4) had actual knowledge of the existence of an additional 1/64th net profits interest as to all Hudson acreage, which Key Oil characterized as an overriding royalty, which burdened the Hudson acreage and was vested in MFP's predecessor/chain of title).

Thus, unequivocally, by Appellees' own definition and admission that the subject overriding royalties and net profits interest were disclosed in the 1996 transaction, the overriding royalties were definite and certain – in fact they were actually known to the Assignee in the 1996 Assignment Agreement, Appellee Key Oil.

Accordingly, Appellees cannot realistically argue that known exceptions/rights should be extinguished and that the term "all" should be given a broad application in the granting clause, but a limited reading, definition or meaning

in the context of the exception and covenant language set forth within the same Assignment Agreement.

Such a reading or argument would lead to the absurd result of parsing the same term within the 1996 Assignment Agreement– which is simply not how the law operates in the context of contract interpretation and analysis wherein all terms and conditions should be given a fair and consistent meaning throughout the body of an instrument.

The same logic applies to the second exception and limitation contained in Exhibit A.

The term "all" must be examined in its contractual context, not in a vacuum, and when this analysis is performed the 1996 Assignment Agreement reveals a definite and certain exception/limitation: "all" that was assigned were "specific parts" of the leasehold estates, forty (40) acre portions upon which then existing wells were drilled, plus a 1,000-foot buffer.

Again, this language is definite and certain as the limitation/exception is tied to a detailed, well specific description contained within Exhibit A to the 1996 Assignment Agreement, depicted below [see next page], all of which was known to the Assignee at the time of the 1996 Assignment Agreement:

ASSIGNMENT AGREEMENT BY AND BETWEEN JAMES I.
SHEARER AND BEATRICE E. SHEARER AND JAMES
DRILLING CORPORATION, AKA, JAMES I. SHEARER
DRILLING CO. AND KEY OIL COMPANY

| API NUMBER | LESSOR | LESSEE | AC. | DATE OF LEASE | CTY./ STATE | REC. BOOK / PAGE |
|---|---|---|---|---|---|---|
| 1. 47-017-0515[4] | Miller | Harsh. | 54 | 8-25-1960 | Dodd. WV | 66/123 |
| 2. 47-017-0467 | Stone | Harsh. | 97 | 7-18-1960 | Dodd. WV | 65/168 |
| 3. 47-017-0589 | Towner | Barker | 34 | 4-22-1961 | Dodd. WV | 68/433 |
| 4. 47-017-0605 | Ford | Shearer | 25 | 7-5-1961 | Dodd. WV | 69/488 |
| 5. 47-085-2784 47-085-2785 | Cox | Harsh. | 79.5 | 11-17-1961 | Ritchie WV | 96/165 |
| 6. 47-017-3876 47-017-0513 47-017-0529 | Hudson | Shearer | 244.6 | 1-14-1961 | Dodd. WV | 67/374 |
| 7. 47-017-0596 47-017-0593 | Hudson | Shearer | 246 | 1-14-1961 | Dodd. WV | 67/370 |

JA316–320.

In closing, a contextual reading of Paragraph 2 of the 1996 Assignment

Agreement that gives effect to every term and condition of, and Exhibit A to, the

---

[4] API well numbers are unique, permanent, numeric identifiers assigned to every oil and gas well in the United States by the American Petroleum Institute.

1996 Assignment Agreement and which aligns with the Appellees' own definition of the term "all" leads to the inescapable conclusion that the 1996 Assignment Agreement was not an all-encompassing grant as held by the District Court, but was rather a restricted and limited grant of already fractured oil and gas wells and related/limited mineral leasehold estates wherein, per the 1996 Assignment Agreements express terms, the existing overriding royalty and net profits interests presently vested in MFP were excepted as valid interests which burdened the mineral leasehold chain(s) of title prospectively. This is the only reading of the 1996 Assignment Agreement that gives the entirety of the 1996 Assignment Agreement effect.

**C.    As The Doctrine Of Merger Has No Relevance To The Present Dispute Given That The Plain Language Of The 1996 Assignment Agreement Preserves And Excepts The ORRI Interests In MFP's Chain Of Title, And As Justice Requires Such A Finding, This Court Should Find That The ORRI Interests Are Vested In MFP.**

As long recognized by the Fourth Circuit, consistent with West Virginia jurisprudence, the doctrine of merger does not operate unless estates are equal and coextensive in right and quality; or if the intention of the parties to a transaction is contrary to the doctrine of merger/justice is promoted by non-application of the merger doctrine:

> In order to effect a merger at law, the right previously existing in an individual, and the right subsequently acquired, in order to coalesce and merge, must be precisely coextensive, must be acquired and held in the

same right, and there must be no right outstanding in a third person, to intervene between the right held and the right acquired. If any of these requisites are wanting, the two rights do not merge, but both may well stand together.

The legal and equitable estates must be coextensive, be commensurate, or there must be the same estate in law as in equity. A court of equity will always prevent a merger to preserve any beneficial interest of the parties, to promote the purposes of justice, or effect the intention of the donor. . . .

Highland Park Mfg. Co. v. Steele, 232 F. 10 (4th Cir. 1916) (internal citation omitted); see also See Conn v. Beckman, 2019 W. Va. LEXIS 409 *18 (W.V.S.C. 2019, memorandum decision) (stating that "in order to extinguish an easement by merger, there must be unity of title and, according to some decisions, of possession and enjoyment of the dominant and servient estates, coextensive in validity, quality, and all other circumstances of right . . . ."); see also Highway Properties v. Dollar Sav. Bank, 189 W.Va. 301, 431 S.E.2d 95 (1993) (noting in FN 4 that there are limitations to the concept of merger summarized in 28 C.J.S. Easements § 57(b) (1941); see also 28A CJS, Easements, § 123 [b], at 307 (stating that a property interest is "not extinguished under the doctrine of merger by the acquisition by the owner of the dominant or servient estate to title to only a fractional part of the other estate.").

Here, multiple prongs of the foregoing framework, and common sense, dictate that the doctrine of merger has no application to this dispute – and the Court's dicta/Appellees' argument should be given no weight by this Court.

First, the intent of the parties is expressed in the plain and unambiguous language on the face of the 1996 Assignment Agreement: the overriding royalty interests and net profit interests defined in the leases or contained in assignments disclosed to Key Oil are to remain valid/in force, and survive the 1996 Assignment, to be paid by Key Oil and Key Oil's successors and assigns, such as Respondent Antero – and this burden runs with the land. JA316–320.

Second, the District Court, and the Appellees, are conflating royalty interests with working interests in the oil and gas estates/leasehold oil and gas estates, which is a distinction with a difference. The byproduct of the failure of the District Court to note this distinction, and the District Court's unfounded dicta, creates a legal minefield.

To expand, a rent, profits or royalty interest in real property is not the same as a fee/working interest in real property or an oil and gas working interest asset,[5] and the District Court's holding makes the existence of such collateral/royalty rights impossible in the event an oil and gas operator owns or operates any part or portion

---

[5] See Black's Law Dictionary, Ab. 7th Edition, 2004, definition of "working interest", which provides as follows: Working interest. Oil & Gas. The right to the mineral interest granted by an oil and gas lease. The term is so called because the lessee acquires the right to work on the lease property to search, develop, and produce oil and gas, and the obligation to pay all costs. – Also termed leasehold interest; operating interest.

of a working interest in an oil and gas leasehold estate – or in the event a surface owner is vested with a royalty estate.

Such a concept defies common sense for a basic reason. Fundamentally, assuming the District Court's analysis is correct, an individual or entity could never own a royalty interest in a property in which it holds any other real property interest (surface or otherwise) – as the royalty interest would "merge" and automatically be extinguished every time such a fact scenario occurred, causing oil and gas operators, such as Antero, to have to execute new lease agreements in all such settings.

This is simply not how these rights operate. Royalty rights are not equal property rights with working/operating oil and gas rights – and the doctrine of merger has no application in the present factual setting.

Third, justice is promoted by finding that the overriding royalty interests and net profit interests are presently vested in MFP based upon the developed record in this matter.

The Appellees cannot claim the benefits of the 1996 Assignment Agreement while rejecting its burdens – particularly when the existence of the overriding royalty and net profits interest was disclosed to the Assignee prior to the closing the 1996 Assignment Agreement and the Appellee/purchaser executed an Assignment Agreement which obligated them to pay all net profits and overriding royalty payment as defined in the leases or any assignments disclosed to the

Assignee/purchaser. <u>See</u> JA521–528 (1996 due diligence documents and Key Oil business records which plainly evidence that at the time the parties contracted/executed the 1996 Assignment Agreement Key Oil: (1) had actual knowledge of the overriding royalty interest burden as to the Towner acreage vested in MFP's predecessor/chain of title; (2) had actual knowledge of the overriding royalty interest burden as to the Stone acreage vested in MFP's predecessor/chain of title; (3) had actual knowledge of the overriding royalty interest burden as to the Hudson acreage vested in MFP's predecessor/chain of title; and (4) had actual knowledge of the existence of an additional 1/64th net profits interest as to all Hudson acreage, which Key Oil characterized as an overriding royalty, which burdened the Hudson acreage and was vested in MFP's predecessor/chain of title).

Indeed, even when conveying instruments have not limited the assumption of overriding royalty interests to known/overriding royalty interests or specifically described the overriding royalty interests, the most on point decision from an oil and gas jurisdiction has held that "all" means "all" – and a rigid application of the doctrine of merger contrary to the intent of the contracting parties would be inequitable. <u>See</u> <u>Page v. Fees-Krey, Inc.</u>, 617 P.2d 1188, 1195-1196 (Colorado, 1980) (also noting, at pg. 1191, that the Page Court addressed the following question "4. Was the two percent overriding royalty interest extinguished by merger when Shawnee acquired all other interests in the lease?").

As common sense, equity and justice require such a finding, the District Court's decision should be reversed and this Court should declare that MFP is historically and presently vested with: (1) 1/64th overriding royalty interest in production from Towner mineral acreage; (2) $1/32^{nd}$ overriding royalty interest in production from Stone mineral acreage; (3) $1/16^{th}$ overriding royalty interest in production from all Hudson acreage; and (4) an additional and distinct $1/64^{th}$ net profits interest in production from all Hudson acreage.

## III.  CONCLUSION

For all of the foregoing reasons, this Court should vacate the District Court's judgment and issue a remand with instructions to enter summary judgment for MFP directing the District Court to enter an Order that MFP is historically and presently vested with: (1) $1/64^{th}$ overriding royalty interest in production from the Towner mineral acreage; (2) $1/32^{nd}$ overriding royalty interest in production from the Stone mineral acreage; (3) $1/16^{th}$ overriding royalty interest in production from all Hudson acreage; and (4) an additional and distinct $1/64^{th}$ net profits interest in production from all Hudson acreage.

*s/ Frank E. Simmerman, III*
Frank E. Simmerman, III, W.V. Bar #11589
SIMMERMAN LAW OFFICE, PLLC
254 East Main Street
Clarksburg, West Virginia 26301
(304) 623-4900

*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of August 2024, I electronically filed the foregoing

"Reply Brief of Appellant" with the Clerk of the Court using the CM/ECF System,

which will send notification of such filing to the following:

Amy M. Smith W. Va. Bar #6454
amy.smith@steptoe-johnson.com
Lauren K. Turner W. Va. Bar #11942
lauren.turner@steptoe-johnson.com
McKenna E. Meadows, W. Va. Bar #14085
mckenna.meadows@steptoe-johnson.com
STEPTOE & JOHNSON PLLC
400 White Oaks Boulevard
Bridgeport, WV 26330
(304) 933-8000

*/s/ Frank E. Simmerman, III*
Frank E. Simmerman, III, W.V. Bar #11589

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. <u>24-1347</u>    **Caption:** <u>Mcardle Family Partnership v. Antero Resources Corp.</u>

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

> **Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

> **Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

> **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ___6309___ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word 2016 _____ [*identify word processing program*] in
14 point Times New Roman _____ [*identify font size and type style*]; or

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Frank E. Simmerman, III, Esq. _____

Party Name Appellant _____

Dated: 8/1/2024 _____